*4
 
 LEVIN H. CAMPBELL, Senior Circuit Judge.
 

 The United States District Court for the District of Massachusetts entered a final judgment in favor of appellee Canon U.S.A., Inc., in a civil antitrust action brought by appellants Aunyx Corporation and Aunyx Business Machines Corporation. Appellants appeal from the judgment as to two of their claims. Because previous proceedings before the International Trade Commission were
 
 res judicata
 
 in respect to the antitrust claim and because no triable issues remained as to the breach of contract claim, we affirm.
 

 I. BACKGROUND
 

 A.
 
 Facts
 

 Aunyx Corporation (“Aunyx Corp.”) and Aunyx Business Machines Corporation (“ABM”) (collectively “Aunyx”) are Massachusetts corporations located in Hingham, Massachusetts. Robert J. Langone (“Lan-gone”) is the president and sole shareholder of both corporations. Appellee Canon U.S.A., Inc., (“Canon”) is a New York corporation and a wholly-owned subsidiary of Canon, Inc., a Japanese corporation. Only Canon U.S.A. is a party to this appeal.
 

 Among other products, Canon markets a line of photocopy machines known as “New Process” (“NP copiers”). These NP copiers employ a dry black powder made from resins and other coloring agents called “NP Toner” to print copies of documents onto paper. NP Toner is manufactured by Canon. All NP copiers need toner to make copies and for all practical purposes NP copiers can only use NP Toner. While other companies have attempted to make toner suitable for use in NP copiers, they have not successfully marketed any significant amount.
 

 NP Toner is marketed in the United States by Canon through a nationwide network of approximately 500 independent, authorized dealers that sell copiers and toner, and are responsible for repairing and servicing the former.
 
 [1]
 
 Three of the dealers were owned by Canon, while the others were independent.
 

 In 1977, Canon organized the Copier Dealer Advisory Council (“DAC”). This council consisted of several varying sized and geographically diverse dealers that periodically met with Canon representatives to discuss matters of mutual interest.
 

 Before 1979, Canon used a form of dealership agreement known as a “Manufacturer/Dealer agreement” pursuant to which Canon appoints dealers as non-exclusive dealers of various Canon products. This Manufacturer/Dealer agreement was subject to cancellation upon ninety days notice and did not make any provision relating to the sale of NP Toner or restricting dealers to selling into specific territories. ABM had signed such an agreement with Canon in 1979 (“the 1979 Agreement”).
 

 In 1983, Canon introduced a new form of dealership agreement (“the 1983 Agreement”) which assigned dealers of NP copiers and NP Toner to specific territories and provided that each dealer could not market products outside its assigned territory. The alleged purpose of the 1983 Agreement was to prevent a practice known as “skating” which basically involved selling products outside the dealer’s primary marketing area. Canon sent Aunyx a copy of the 1983 Agreement for its signature but Au-nyx did not sign it.
 

 In the summer of 1985, Aunyx embarked upon a program of selling large amounts of NP Toner, purchased from Canon, to end users throughout the United States. On October 15, 1985, the Vice-President of Canon Copier Division sent a letter to the President of Aunyx, Mr. Langone, advising him that Canon was aware that Aunyx had been purchasing NP Toner from Canon in quantities far in excess of what would be required to maintain the NP copiers it had purchased, and that Aunyx had been selling Canon NP Toner “outside its primary sales area and on a national basis, in violation of Canon’s well-known established poli
 
 *5
 
 cy.” The letter informed Aunyx that as óf October 16, 1985, Canon would limit the amount of NP Toner that Aunyx could buy to no more than 250 cases per month.
 

 B.
 
 Proceedings Below
 

 On July 15, 1986, Aunyx filed its original complaint in the United States District Court for the District of Massachusetts charging Canon with a myriad of violations.
 
 See infra
 
 note 2. An amended complaint was filed on June 12, 1987. The original plaintiff was Aunyx Corp., and the original defendants were Canon, Inc., and Canon U.S.A. ABM was added as a plaintiff on the motion of Aunyx Corp. filed on June 12, 1987, and allowed on December 17, 1987.
 

 A further ten-count
 
 [2]
 
 amended complaint was filed on April 14, 1988 (“the Second Amended Complaint”). The Second Amended Complaint. dropped Canon, Inc., as a party defendant, leaving as defendant only Canon U.S.A.
 

 On the same day it filed its original complaint, July 15, 1986, Aunyx commenced proceedings before the International Trade Commission (“ITC”) in Washington, D.C., against Canon U.S.A. and Canon, Inc., under section 337 of the Tariff Act of 1930,19 U.S.C. § 1337.
 
 [3]
 
 The district court action was put “on hold” awaiting the decision of the ITC.
 

 In the ITC proceedings, Aunyx engaged in extensive discovery which included substantial document production, more than a hundred written interrogatories, and the oral depositions of 33 individuals over a period of 70 days. The entire prehearing discovery lasted almost one year.
 

 Roughly eight months after its original filing before the ITC, on March 17, 1987, Aunyx moved to amend its ITC Complaint to add a claim that Canon and its retail dealers had entered into a horizontal conspiracy to divide the United States market for NP toner among the dealers in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. In an order entered April 15, 1987, an Administrative Law Judge (“AU”) denied Aunyx’s motion on the ground of untimeliness. The ALT concluded that the requested amendment “would impose an impossible burden upon the parties to complete their discovery and prepare for hearing.” Aunyx never sought review of the denial of its motion to amend.
 

 The ITC’s proceedings terminated in an order adverse to Aunyx. Aunyx at first sought review of the ITC’s decision in the United States Court of Appeals for the Federal Circuit, but thereafter moved to dismiss its petition for review. Aunyx’s motion to dismiss its petition for review of the ITC proceedings was allowed, and the petition was dismissed on August 2, 1988.
 

 Upon completion of the proceedings before the ITC and the dismissal of its review • petition before the Federal Circuit, Aunyx reactivated its lawsuit in the district court. On November 22, 1988, Canon filed a motion for summary judgment. Accompanied by exhibits relating to the ITC proceedings, this motion urged that the ITC proceedings had
 
 res judicata
 
 effect upon the district court proceedings. On June 6, 1989, District Judge McNaught issued a Memorandum and Order ruling upon the motion for summary judgment. Judge McNaught concluded that Counts 1, 2, 5, 6, 7 and 9 of the Second Amended Complaint had been fully litigated in the ITC case and thus
 
 *6
 
 were barred from further consideration by the doctrine of
 
 res judicata.
 
 As for counts 3 and 4, which asserted claims under state law,. Judge McNaught concluded that they were also barred from further consideration by the doctrine of collateral estoppel or issue preclusion. He found, however, that the AU’s denial of Aunyx’s motion to add its related horizontal conspiracy theory set forth in Count 8, and the AU’s failure to consider the breach of contract claim presented in Count 10, had deprived Aunyx of the opportunity to fully litigate those claims before the ITC. As a result, he refused to grant summary judgment as to these two counts. The district court entered final judgment on Counts 1 through 7 and Count 9 on August 17, 1989. No appeal to this court has been taken from that judgment.
 

 On June 8,1990, Canon filed a motion for summary judgment seeking dismissal of all of Count 8 and of Count 10 to the extent it alleged a breach of contract arising from Canon’s restrictions on Aunyx’s toner purchases. On September 11, 1990, Judge McNaught refused to dismiss Count 8 but allowed the motion for summary judgment in respect to part of Count 10. Due to the anticipated retirement of Judge McNaught, the case was reassigned to Judge Rya W. Zobel on December 5, 1990.
 

 A jury trial on Count 8 began on March 11, 1991, and continued for six days. On March 19, 1991, Judge Zobel directed’ a verdict in favor of Canon on Count 8 (horizontal conspiracy), concluding that Aunyx did not present evidence from which a jury could infer antitrust injury. Trial on what remained of Count 10 was scheduled to commence on June 10, 1991. On June 4, 1991, the district court ordered the plaintiffs to notify the defendant and the court of their contentions as to the issues remaining to be tried. The plaintiffs did so the following day.
 

 On June 11, 1991, the district court published a “Further Order Concerning Count [10]” stating that nothing remained to be tried and ordering that judgment be entered for Canon on Count 10. Final judgment was entered by the district court on Counts 8 and 10 on June 27, 1991. This appeal followed.
 

 II. DISCUSSION
 

 A.
 
 Count 8: Res Judicata
 

 Although the district court did not consider the issue of whether the ITC proceedings had
 
 res judicata
 
 effect on Count 8 when it granted a directed verdict in Canon’s favor, we do so now, mindful that “we need not limit ourselves to the exact grounds for decision utilized below. We are free, on appeal, to affirm a judgment on any independently sufficient ground.”
 
 Polyplastics, Inc. v. Transconex, Inc.,
 
 827 F.2d 859, 860-61 (1st Cir.1987);
 
 see also Medina-Muñoz v. R.J. Reynolds Tobacco Co.,
 
 896 F.2d 5, 7 (1st Cir.1990);
 
 Garside v. Osco Drug, Inc.,
 
 895 F.2d 46, 49 (1st Cir. 1990).
 

 The doctrine of
 
 res judicata
 
 bars all parties and their privies from relitigating issues which were raised or
 
 could have been raised
 
 in a previous action, once a court has entered a final judgment on the merits in the previous action.
 
 United States v. Alky Enterprises, Inc.,
 
 969 F.2d 1309, 1314 (1st Cir.1992). The essential elements of
 
 res judicata,
 
 or claim preclusion, are (1) a final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause of action in both the earlier and later suits.
 
 Kale v. Combined Insurance Co. of America,
 
 924 F.2d 1161, 1165 (1st Cir.),
 
 cert, denied,
 
 — U.S.-, 112 S.Ct. 69, 116 L.Ed.2d 44 (1991).
 

 In
 
 Manego v. Orleans Board of Trade,
 
 773 F.2d 1, 5 (1st Cir.1985),
 
 cert. denied,
 
 475 U.S. 1084, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986), we adopted the “transactional” definition of
 
 res judicata
 
 of the
 
 Restatement (Second) of Judgments
 
 § 24 which provides:
 

 (1) When a valid and final judgment rendered in an action extinguishes the plaintiff’s claim pursuant to the rules of merger or bar ..., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transac
 
 *7
 
 tion, or series of connected transactions, out of which the action arose.
 

 (2) What factual grouping constitutes a “transaction”, and what groupings constitute a “series”, are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties’ expectations or business understanding or usage.
 

 Restatement (Second) of Judgments
 
 § 24 (1982). The fact that different legal theories are presented in each case does not mean that the same transaction is not behind each.
 
 Manego v. Orleans Board of Trade,
 
 773 F.2d at 6. “[S]o long as different theories of recovery, however prolific, derive from the same cause of action, the requisite identity is achieved if, and to the extent that, all such theories concern ‘the same operative nucleus of fact.’ ”
 
 Kale v. Combined Insurance Co. of America,
 
 924 F.2d at 1166.
 

 Normally, decisions of administrative agencies are entitled to
 
 res judicata
 
 effect when the agency acted in a judicial capacity.
 
 University of Tennessee v. Elliott,
 
 478 U.S. 788, 797-798, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986);
 
 United States v. Utah Construction & Mining Co.,
 
 384 U.S. 394, 421-422, 86 S.Ct. 1545, 1559-1560, 16 L.Ed.2d 642 (1966);
 
 McCuin v. Secretary of Health & Human Servs.,
 
 817 F.2d 161, 172 (1st Cir.1987);
 
 Restatement (Second) of Judgments
 
 § 83 (1982).
 
 [4]
 
 The Second Circuit has held that ITC decisions in Section 337 proceedings are entitled to
 
 res judicata
 
 effect.
 
 Union Manufacturing Co. v. Han Baek Trading Co.,
 
 763 F.2d 42, 45-46 (2d Cir.1985).
 

 In this case all three requirements for
 
 res judicata
 
 have been satisfied. First, Aunyx’s failure to appeal from the ITC’s order, which decided Aunyx’s claim on the merits, rendered it final. The identity of parties requirement was also satisfied, even though ABM was not a party to the ITC proceedings. Aunyx had adequate interest in litigating ABM’s interests before the ITC. Moreover, Aunyx explicitly repre
 
 *8
 
 sented to the district court that ABM was
 
 its alter ego/.
 

 [5]
 

 As for the requirement of identity of the cause of action, we are satisfied that the claims asserted in the ITC action and in the subsequent action in the district court were sufficiently related to satisfy the transactional analysis variant of the
 
 res judicata
 
 doctrine. The gist of ■ Aunyx’s claim in the district court action was that Canon and its dealers adopted the 1983 agreement to allocate markets for Canon NP Toner. That was the same claim made before the ITC. Both claims were founded upon the same transaction and arose out of the same nucleus of operative fact. They sought redress for essentially the same alleged wrong notwithstanding any differences in remedies sought or theories of recovery pleaded. A second action may be barred under the doctrine of
 
 res judicata
 
 even though a different legal theory or source of law is involved.
 
 See
 
 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
 
 Federal Practice and Procedure
 
 § 4411 at 86-87 (1981).
 

 The record reflects that Aunyx knew enough about the facts of this case to have been able to assert its horizontal conspiracy claim at the outset before the ITC.
 

 It is immaterial that the plaintiff in the first action sought to prove the acts relied on in the second action and was not permitted to do so because they were not alleged in the complaint and an application to amend the complaint came too late.
 

 Restatement (Second) of Judgments
 
 § 25 cmt. b (1982). Thus, we hold that Count 8 is barred, as a matter of law, by
 
 res judica-ta.
 
 Aunyx’s action under Count 8 being barred by
 
 res judicata,
 
 we need not consider the remaining issues related to that count raised by Aunyx.
 

 B.
 
 Count 10: Pretrial Dismissal
 

 We turn now to whether Judge Zobel erred in dismissing before trial Aunyx’s claim under Count 10. We think not. After a pretrial conference on May. 23, 1991, the parties submitted memos to the court regarding the issues remaining to be tried under Count 10. Aunyx identified three issues, two of which were based on an alleged right to purchase NP Toner from Canon. Canon disagreed, and on June 4, 1991, Judge Zobel wrote that the claims under Count 10 which related to an alleged right to purchase NP Toner had been dismissed by Judge McNaught on September 11, 1990, leaving only the issue of the lawfulness of Canon’s unilateral termination of the 1979 Agreement. Judge Zobel ordered Aunyx to again notify the defendant and the court of its contentions as to the issues remaining to be tried with respect to Count 10. Specifically, because Aunyx had already admitted that it had failed to pay Canon $70,000 due under the 1979 Agreement, the judge asked Aunyx to provide some evidence that “plaintiff’s failure to pay was attributable to some unlawful conduct of defendant not heretofore tried or resolved.” In response, Aunyx again argued that it had contractual rights to purchase NP Toner under an “extended course of dealings,” and that the prior grant of summary judgment decided only that Au-nyx had no
 
 express
 
 contractual right to purchase toner under the 1979 Agreement. Judge Zobel rejected this argument and subsequently dismissed what remained of Count 10 because Aunyx failed to offer any evidence to show that Canon unlawfully terminated the 1979 Agreement.
 

 Aunyx’s sole argument on' appeal is that Judge Zobel misconstrued Judge McNaught’s September 11, 1990, grant of partial summary judgment. Because Judge Zobel’s pretrial order of June 11, 1991, decided all remaining issues in Canon’s favor, we treat the order as a grant of summary judgment.
 
 See
 
 3 James Wm. Moore et al.,
 
 Moore’s Federal Practice
 
 ¶ 16.21, at 16-113 (2d ed. 1992). Aunyx
 
 *9
 
 claims that Judge McNaught never decided whether it had an
 
 implied
 
 right to buy toner, outside of its rights under the 1979 Agreement. In contrast, Judge Zobel interpreted that ruling as holding that Aunyx had no contractual right, express or implied, to purchase toner from Canon, leaving only the issue of whether Canon’s termination of Aunyx’s dealership was a breach of the 1979 Agreement.
 

 We find no support for Aunyx’s begrudging interpretation of Judge McNaught’s grant of summary judgment. Count 10 in the Second Amended Complaint read:
 

 Canon has breached the terms of its contract with ABM in that it has applied geographic scope limitations not provided in the contract and has applied quantity limitations of ERMT [toner] not authorized by the contract, both of which contributed to monetary losses by ABM and Aunyx and by placing ABM in a financial condition such that it has reduced ABM’s ability to pay for ERMT supplied in limited quantities under the contract. Canon has without cause unilaterally cancelled the contract.
 

 Thus, Count 10 raised two separate claims: (1) Canon breached its contract by limiting ABM’s right to buy unlimited quantities of toner and to distribute the toner without geographic limitation; and (2) Canon breached its contract with Aunyx by terminating Aunyx’s dealership. On June 6, 1990, Canon moved for summary judgment on Count 10 “to the extent it asserts a breach of contract arising from the defendant’s alleged failure to supply plaintiffs with unlimited quantities of Canon-brand toner for use in Canon NP 210-500 Copiers.” Canon argued on the motion that Aunyx had no contract right, either express or implied, to purchase toner from Canon. In response, Aunyx conceded that it had no “express contractual right to purchase any particular quantities of NP Toner from Canon (or, for that matter, to purchase any NP Toner at all from Canon).” Aunyx argued, however, that it had a right to purchase toner from Canon in quantities “not limited by reason of an unlawful combination or conspiracy between Canon and others.”
 

 On September 11,1990, Judge McNaught granted Canon’s motion for partial summary judgment as to Count 10. Citing his previous order denying Aunyx’s request for a preliminary injunction, he wrote:
 

 there is “no solid basis for the claim in contract that the plaintiff has the right to purchase supplies to be distributed nationwide. There is nothing in the dealings [between Canon and Aunyx] which allows plaintiff to demand to be treated as a wholesaler rather than as a retail dealer of copiers.” Nothing presented by way of affidavit, exhibits or memorandum has persuaded me that my earlier decision was incorrect. The 1979 agreement dealt with copiers, not toner. Defendant’s argument is simply unconvincing that regardless of the absence of an express provision about supplies, the contract embodied the obligation of good faith and fair dealing.
 

 We interpret Judge McNaught’s ruling as deciding that Aunyx had no contractual right to purchase toner from Canon arising (a) from the 1979 Agreement, (b) from any obligation of good faith and fair dealing in that agreement, or (c) from the dealings between the parties. No objection was made to Judge McNaught’s determination at the time, nor have appellants put forward any argument in the course of this appeal challenging it. Accordingly, we will not review it for error.
 
 See Brown v. Trustees of Boston Univ.,
 
 891 F.2d 337, 352 (1st Cir.1989),
 
 cert. denied,
 
 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990) (holding that potential issues not supported by argument in appellant’s brief are deemed abandoned);
 
 Zanditon v. Feinstein,
 
 849 F.2d 692, 702 (1st Cir.1988) (stating that a grant of summary judgment not timely objected to will not be reviewed on appeal);
 
 Clauson v. Smith,
 
 823 F.2d 660, 666 (1st Cir.1987) (“In the absence of extraordinary circumstances, ... we have regularly declined to consider points which were not seasonably advanced below.”).
 

 As Judge McNaught had dismissed all of Aunyx’s claims based on a contractual right to purchase toner,
 
 supra,
 
 the only issue that remained under Count 10 on the
 
 *10
 
 eve of the scheduled trial was whether Canon’s termination of Aunyx’s dealership was, separately, a breach of the 1979 Agreement. Judge Zobel ordered judgment in favor of Canon on Count 10 without a trial on that issue. Despite Judge Zobel’s request, Aunyx offered no evidence to create a genuine issue of material fact as to whether Canon’s termination of the contract was lawful. The only justification offered — that Canon had violated antitrust laws — was rendered impotent when Canon won a directed verdict on the antitrust claims. We hold that Canon was entitled to prevail on Count 10 as a matter of law, and that Judge Zobel committed no error in ordering judgment in favor of Canon on Count 10 without a trial.
 

 The judgment of the district court is affirmed. Costs to appellee.
 

 [1]
 

 . The copiers industry is a service intensive industry. NP copiers would last indefinitely if properly serviced and maintained.
 

 [2]
 

 . The complaint contained the following claims: Count 1: Monopolization and Attempted Monopolization; Count 2: Exclusive Dealing; Count 3: Violation of the Massachusetts Antitrust Laws; Count 4: Unfair Methods of Competition under Massachusetts Law; Count 5: Interference with Contractual Relations; Count 6: Interference with Business Relations; Count 7: Disparagement; Count 8: Horizontal Market Division Among Canon Dealers in Violation of § 1 of the Sherman Act; Count'9: Unlawful Price Discrimination; and Count 10: Breach of Contract.
 

 [3]
 

 . As written at the time of the commencement of this case, this section provided in relevant part:
 

 Unfair methods of competition and unfair acts in the importation of articles into the United States, ... the effect or tendency of which is ... to restrain or monopolize trade and commerce in the United States, are declared unlawful____ 19 U.S.C. § 1337(a) (1980).
 

 [4]
 

 . Section 83 of the
 
 Restatement (Second) of Judgments
 
 provides:
 

 Adjudicative Determination by Administrative Tribunal
 

 (1) Except as stated in Subsections (2), (3), and (4), a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judica-ta, subject to the same exceptions and qualifications, as a judgment of a court.
 

 (2) An adjudicative determination by an administrative tribunal is conclusive under the rules of res judicata only insofar as the proceeding resulting in the determination entailed the essential elements of adjudication, including:
 

 (a) Adequate notice to persons who are to be bound by the adjudication, as stated in § 2;
 

 (b) The right on behalf of a party to present evidence and legal argument in support of the party’s contentions and fair opportunity to rebut evidence and argument by opposing parties;
 

 (c) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof;
 

 (d) A rule of finality, specifying a point in the proceeding when presentations are terminated and a final decision is rendered; and
 

 (e) Such other procedural elements qs may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions.
 

 (3) An adjudicative determination of a claim by an administrative tribunal does not preclude relitigation in another tribunal of the same or a related claim based on the same transaction if the scheme of remedies permits assertion of the second claim notwithstanding the adjudication of the first claim.
 

 (4) An adjudicative determination of an issue by an administrative tribunal does not preclude relitigation of that issue in another tribunal if according preclusive effect to determination of the issue would be incompatible with a legislative policy that:
 

 (a) The determination of the tribunal adjudicating the issue is not to be accorded conclusive effect in the subsequent proceedings; or
 

 (b) The tribunal in which the issue subsequently arises be free to make an independent determination of the issue in question.
 

 [5]
 

 . In its motion to add ABM as a plaintiff in the district court action against Canon, Aunyx stated:
 

 The grounds for this motion are that the corporate interrelationship of Aunyx Corporation [Aunyx] and Aunyx Business Machines Corporation [ABM] is such that each may be considered the
 
 alter ego
 
 of the other in their participation in marketing of toner in interstate commerce.